Kenneth CARLIN, Appellant,

v.

Margaret Elizabeth CARLIN, Appellee.

No. 09–02–057 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Oct. 17, 2002.

Decided Dec. 19, 2002.

C. Lynn Daughrity, Port Arthur, for appellant.

Gary H. Gatlin, Jasper, for appellee.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

Kenneth Carlin appeals the trial court's "Order Granting Extension Of Alimony." Kenneth and appellee, Margaret Elizabeth Carlin, were divorced on May 28, 1998. Kenneth and Margaret consented to the terms contained in the final decree of divorce to the extent permitted by law. One of the provisions agreed to by the parties provided for Margaret to receive a monthly spousal maintenance payment of $1,100. Said payment was based upon Margaret having been found eligible by the trial court for spousal maintenance pursuant to Chapter 8 of the Texas Family Code. *See* TEX. FAM.CODE ANN. §§ 8.001–8.305 (Vernon Supp.2002).[1] At the time of the divorce, Margaret's eligibility for spousal maintenance was apparently due to her having developed rheumatoid arthritis during the marriage, either in the year 1983 or 1984.

The portion of the 1998 decree upon which we must focus reads, in pertinent part, as follows:

(C) The Court finding that [Margaret] is eligible for maintenance pursuant to Chapter 8, *Texas Family Code*, [Kenneth] is ORDERED to pay to [Margaret] the sum of $1,100.00 per month with the first payment thereon being due on June 1, 1998, and the payments thereafter being due and payable on [Kenneth's] pay days to amount to $1,100.00 per month, until the earliest of one of these events occurs:

. . . .

(2) Three (3) years from and after the date of this Decree unless [Margaret] continues to be unable to support herself at appropriate employment because of the incapacitating physical

disability which the Court finds she is subject to as of May 1, 1998[.]

Prior to the decree's three-year anniversary date, Margaret's trial counsel sent a letter to Kenneth. We reproduce pertinent portions from the letter:

I have been employed by your ex-wife, Ms. Margaret Carlin, regarding the Temporary Alimony which you are presently paying to her. Under the terms of the Decree of Divorce, the alimony benefits will cease effective May, 2001, unless it is shown that Ms. Carlin is still disabled. The purpose of this letter is to pose two questions so that I will know whether I need to proceed with filing the appropriate Motion to have that extended:

1. Will you agree to an Agreed Order being entered, acknowledging the fact that Ms. Carlin is still under the disability that she was under at the time the Decree was entered?

2. Will you be agreeable to furnish proof of your present earnings for re-computation of the alimony benefits?

The record indicates that Kenneth did not respond to the letter from Margaret's trial counsel. On June 7, 2001, Margaret filed an instrument with the trial court entitled, "Motion For Extension Of Alimony." In said motion, Margaret alleged: "Three years have passed since the date of the first payment and the disability of which Margaret Elizabeth Carlin was under at the time of entry of the Decree of Divorce continues and has increased in severity and therefore she is still incapacitated." Margaret further requested the trial court to order Kenneth to continue the $1,100 monthly support payments un-

---

1. All subsequent statutory references are to provisions contained in the Texas Family Code currently in effect unless otherwise noted.

less his earnings had increased in which case the monthly support amount should also increase. Margaret's prayer to the trial court requested the $1,100 payments from Kenneth continue "until said disability ceases, her death or her remarriage[.]" Kenneth answered with a general denial.

An evidentiary hearing was conducted by the trial court with Kenneth and Margaret being the key witnesses.[2] At the conclusion of the hearing, the trial court requested each party submit written summation and argument and withheld ruling until a later date. Following the filing of the written arguments, the trial court ruled that the spousal maintenance would continue in the amount of $1,100. This ruling was memorialized by the order granting the extension of "alimony." Findings of fact and conclusions of law were also filed by the trial court.

On appeal, Kenneth complains that the trial court abused its discretion in "deciding" Margaret was unable to support herself because of an incapacitating physical disability, and also by "failing to decide" that a material and substantial change had taken place in Kenneth's circumstances warranting a reduction in his monthly spousal support obligation. The somewhat detailed procedural history set out above is warranted by the fact that the issues present us with a case of first impression as they arise from what appears to be an extension of the spousal support provisions contained in the 1998 decree. Although our research has turned up a number of appellate decisions involving the propriety of granting or denying a request for inclusion of spousal maintenance in the final divorce decree,[3] we have found no appellate decision in which review of a subsequent modification or extension of spousal maintenance by the trial court was at issue.

## APPLICABLE LAW

■ Kenneth argued to the trial court, as he now does to us, that the instant cause filed by Margaret is a "modification" of the 1998 decree under the provisions of Section 8.057. While not explicitly taking issue with Kenneth's "modification" argument, Margaret appears to characterize her action as an attempt to extend or "continue" what the parties had already agreed to in the 1998 decree. At the same time, however, Margaret also seems to take the position that the 1998 decree provided for cessation of spousal maintenance payments upon reaching "the earliest of one of five contingencies." As quoted above, that provision does appear to terminate the spousal maintenance at the end of three years from the date of the decree. On closer examination, however, the clause following the word "unless" seems to be the operative one. Said clause provides that if Margaret "continues" to be unable to support herself because of her "incapacitating physical disability," which she was found to have as of May 1, 1998, then the spousal support payments would continue. Therefore, Margaret's petition is not so much a motion to modify the 1998 decree as it is either a request of the trial court to review facts in order to determine whether Margaret's disability is continuing, *see* Section 8.054(b), or, less likely, a motion to

---

2. Margaret's trial counsel briefly testified as to attorney's fees but this testimony is not pertinent to the instant appeal.

3. *See Amos v. Amos,* 79 S.W.3d 747 (Tex.App.-Corpus Christi 2002, no pet.); *O'Carolan v. Hopper,* 71 S.W.3d 529 (Tex.App.-Austin 2002, no pet.); *Pickens v. Pickens,* 62 S.W.3d 212 (Tex.App.-Dallas 2001, pet. denied); *Lopez v. Lopez,* 55 S.W.3d 194 (Tex.App.-Corpus Christi 2001, no pet.); *In re Hale,* 975 S.W.2d 694 (Tex.App.-Texarkana 1998, no pet.); and *DuBois v. DuBois,* 956 S.W.2d 607 (Tex.App.-Tyler 1997, no writ).

enforce the maintenance order as by the filing date Kenneth had ceased to make the monthly payments. *See* Section 8.059(a). While the record is silent as to Margaret and Kenneth's intent for including the "Three (3) years" language in Contingency Two of the 1998 decree, a reasonable reading, in light of the statute, would be that the parties intended for judicial review, after the expiration of three years, of Margaret's inability to support herself at appropriate employment because of her disability.

The significance for our properly framing the cause of action in the trial court is that under the provisions for modifying the 1998 decree, Margaret would have been required to prove "a material and substantial change in circumstances" of either herself or Kenneth. *See* Section 8.057(c). By contrast, a mere request for the trial court to review continuation of the spousal maintenance order appears to place no special burden of proof on the petitioner. *See* Section 8.054(b). Therefore, we find Margaret's burden at trial was to prove to the trial court that her incapacitating physical disability was continuing so as to prevent her from supporting herself through appropriate employment by a preponderance of the evidence. *See Ellis County State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex. 1994) (In civil cases, unless a more onerous burden is mandated, all issues of fact are resolved from a preponderance of the evidence.).

The parties agree that the standard of appellate review is abuse of discretion. The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, that is without reference to guiding rules and principles. *See In the Interest of A.D.H.*, 979 S.W.2d 445, 446 (Tex. App.-Beaumont 1998, no pet.). Under the abuse of discretion standard, legal and factual sufficiency of the evidence, although

not independent grounds for asserting error, are relevant factors in assessing whether the trial court abused its discretion. *See In the Interest of A.D.D.*, 30 S.W.3d 609, 614 (Tex.App.-Texarkana 2000, no pet.). Because we have a complete reporter's record before us, the trial court's findings of fact are not conclusive as to our review. *See Swanson v. Swanson*, 148 Tex. 600, 228 S.W.2d 156, 158 (1950); *Mohnke v. Greenwood*, 915 S.W.2d 585, 589 (Tex.App.-Houston [14th Dist.] 1996, no writ); *Armstrong v. Armstrong*, 601 S.W.2d 724, 727 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.).

■ Recall that, as petitioner, Margaret had the burden to prove to the trial court that she was still unable to support herself at appropriate employment because of the incapacitating physical disability which she was found to be under in 1998, by a preponderance of the evidence. As we view her burden, Margaret was required to prove two facts, *viz:* (1) that she was still suffering from an incapacitating physical disability, and (2) that said incapacitating physical disability prevented her from being able to support herself at appropriate employment.

## THE EVIDENCE: INCAPACITATING PHYSICAL DISABILITY

Kenneth was the first witness called and testified very briefly. Pertinent testimony from Kenneth was limited to the fact that Margaret was diagnosed with rheumatoid arthritis in 1984 and that her condition "progressively worsen[ed]" from the time of diagnosis until the divorce in 1998. There was no attempt by Margaret's trial counsel to have Kenneth describe specifically how Margaret's condition progressively worsened during the fourteen years of their marriage following the initial diag-

nosis. Kenneth was not cross-examined and the final witness was Margaret.[4]

Margaret testified that she did indeed have rheumatoid arthritis and had developed it sometime around 1983 or 1984. Trial counsel then inquired about the braces Margaret was wearing on her legs. Margaret replied that the braces enabled her to walk as her ankles were not stable enough to walk without pain. Trial counsel then inquired if she had worn the braces prior to the divorce. Margaret responded as follows:

A. I wore a brace on my left leg for awhile and then the doctor fused my left ankle and it did fine for awhile; and then I twisted my ankle out in the yard and then when it continued to hurt and get worse and worse and when I went back to the doctor about them—this was after—

Q.[Margaret's Counsel] The divorce.

A. —my divorce.

. . . .

A. He said at this time surgery would not do any good, we would wear my braces for—and see how long they would hold up,—

Q. Okay.

A. —my ankles would hold up.

We note from Margaret's responses that, since the divorce, she apparently began wearing a brace on her right leg, but it is unclear whether that was a result of her rheumatoid arthritis or the result of having twisted her ankle or a combination of both.

Margaret went on to testify that her arthritis was not restricted to her legs but affected all the major joints of her body. The record then reflects the following exchange:

Q.[Margaret's Counsel] Okay. Have you had any surgeries since the time of the divorce?

A. Yes, sir. I've had hand surgery on both my hands.

Q. Okay. I apologize for asking, but can you show—show us your hands.

A. (Indicating.) I had joint replacement on these on both hands at different times. This one, one time and this one six months later.

Q. Okay.

A. And they—on my wrists—on my left and right wrists they cleaned the tendons and ligaments out to take the nodules off so they wouldn't rip my tendons, and he fuzed [sic] my right thumb.

. . . .

Q. And they did the surgical procedures, and is that when they fused the thumb then?

A. Yes, sir.

Q. Okay.

A. Fused my—on my right hand.

Q. Have you had any other surgeries since approximately then the summer of '99?

A. No.

Margaret then went on to describe problems with one of her shoulders and then attempted to describe physical limitations stemming from her arthritis. Such evidence would be pertinent to proving the "incapacitating" nature of her disability. The record reflects the following testimony from Margaret:

Q.[Margaret's Counsel] All right. Can you tell us what that was.

A. A shoulder specialist at Fondren told me I needed orthoscopic [sic] sur-

---

**4.** Although Margaret's trial counsel briefly testified as to attorney's fees his testimony is not pertinent to this appeal.

gery on my left shoulder to clean out the nodules. And I went to the doctor because as I sweep usually I move a lot and my shoulders always hurt, and I rolled over one night and my left shoulder was hurting real bad and so I rolled over the other way to get off of it and when I got up the next morning I was like black and blue (indicating).

Q. All right. And you're indicating where?

A. Between my elbow and my left shoulder.

Q. Okay.

A. This area (indicating). And the doctor told me that nodules, the rheumatory [sic] nodules, had ruptured a little art—blood vessel or a little vein or something in there and that's what caused the hemorrhaging and that's why they suggest I have the surgery on my shoulder.

Q. All right. Do you have any restrictions on how far you can raise your left hand?

A. Yes.

Q. And what is that restriction?

A. About that (indicating). Like that. I mean, I can raise it with my other arm, but that's all I can do without pain. I mean, I can raise it about here (indicating).

Q. Okay. As far as being able to get up and get about and do tasks, do you have any restrictions there? And I'm not asking for what a doctor may have told you, just what you physically can and cannot do.

A. Well, I can—I can make up my bed.

Q. Okay.

A. I wash my dishes. I can clean up so high, dust or something, and I vacuum my floors and I mop them whenever I can.

Q. Can you—you were telling me this morning about a—how long it takes you to mop the certain area in your house.

A. My living room and dining room and kitchen hear [sic] are all—run together, but yes, I can mop my own house but it takes me anywhere from two to three hours, because whenever my ankles when I stand a long time they hurt and move about a lot. So whenever they get to hurting I sit down a while and rest a while and when they quit I get up and work some more.

On cross-examination, Kenneth's trial counsel did not question the fact that Margaret continued to suffer from rheumatoid arthritis, but did attempt to show, from Margaret herself, that her arthritis was not at the "incapacitating" stage. The record reflects the following exchanges:

Q.[Kenneth's Counsel] As a matter of fact, the house that you live in that you have a hard time mopping is 3800 square feet; is that correct?

A.[Margaret] Yes.

Q. Four bedrooms and three baths, I believe?

A. Correct.

. . . .

Q. You also testified that you do all your own driving; is that right?

A. Sir?

Q. You do—you drive?

A. Yes, sir.

Q. As a matter of fact, you and one of your relatives took some other relatives of y'all's a couple of months ago about 700 mile road trip one way to somewheres in West Texas and back; is that right?

A. Correct.

Q. And you did about half the driving?

A. Probably.

Q. You can use a telephone, both push-button and rotary dial; is that right?

A. I can use a push-button easily.

Q. You told me the other day you use—can dial a rotary phone with a pencil; is that right?

A. True.

Q. And you also told me that the surgeries that you had on your hands two years ago significantly improved the usage of your hands; is that right?

A. This is true.

Q. So actually your hands are in better shape than what they were two years ago?

A. Yes.

. . . .

Q. Okay. I think you also told me that you do your own cooking and your own household work; is that right?

A. Yes.

Q. You take care of your mom;—

A. Yes.

Q. —is that correct?

As a matter of fact, you've told me that you thought you gave her very adequate care?

A. I beg your pardon?

Q. You told me on—in your deposition, I believe, that you thought that the care you gave your mom, whose [sic] an Alzhemiers [sic] patient, was very adequate?

A. At this time it is.

. . . .

Q. I think you told me the other day that you sometimes attend games of your grandkid's [sic]; is that correct?

A. I go to my granddaughter's volleyball game and I go watch my grandsons play football.

Q. Okay. And where are those games held?

A. Some are here, some are—we have one tonight in Kirbyville. It depend [sic] on where they are.

Q. Volleyball games are done inside in a gym?

A. Yes, they are.

Q. You sit up in the bleachers?

A. Yes, I do.

Q. So you're able to climb up in the bleachers; is that right?

A. One up. Not by myself.

## EVIDENCE: APPROPRIATE EMPLOYMENT

Our examination of the record for evidence of Margaret's inability to support herself at appropriate employment is sparse. All that appears under both direct and cross-examination of Margaret is reproduced as follows:

Q.[Margaret's Counsel] Okay. At the time of the entree [sic] of the Decree of Divorce were you employed anywhere outside the home?

A.[Margaret] No.

. . . .

Q. All right. What work prior to the divorce—what type of work had you done outside the home and when in relation to the divorce?

A. I had been doing teller work and banking. I worked at a doctor's office for awhile.

Q. Okay. And when was the last time you had work outside the home?

A. The year we went overseas and I think that was about '84, '85.

Q. Since the time of the divorce have you been able to work outside the home any?

A. Not until just recently.

Q. All right. And where—where are you employed now?

A. At Ace Hardware.

Q. Okay. And how did you—well, I'm sorry, strike that. What type of work do you do for them?

A. Reconciling and balancing—making the bank deposits.

Q. Okay. Bookkeeping—

A. Yes.

Q. —nature type work?

A. Yes.

Q. And what are your work hours?

A. I work from 7:00 to about 11:00, 11:30.

. . . .

Q. Five days of the week?

A. Oh, yes, sir.

Q. With that job are you able to alternately sit and stand as you deem necessary?

A. Yes, sir.

Q. And what are you paid? How much—

A. $6 an hour.

Q. Okay. So you make about 120 hours [sic] a week gross?

A. About.

Q. And how did you come upon this job, Ms. Carlin?

A. Well, I had been seriously thinking about finding some type of bookkeeping to do when I got my mother situated and the people at Ace Hardware knew my situation, and my daughter is manager at Ace Hardware and she—her man—the owners gave her an application for me to bring home. I could not go ask for an application there because they have a policy of not hiring family.

Q. Okay.

A. And they said they'd been talking about it and they asked Pam to bring it home to me and to fill out. I filled it out, took it up there and they hired me.

Q. Okay. Does that seem to be working—working pretty good?

A. Yes, sir.

. . . .

Q. Do you think your body can stand up to working?

A. I couldn't stand up to doing what I'm doing now all day long.

Q. Okay. Why?

A. Well, if I stand too long to file or anything like that I have to sit down because of my ankles, and I can't stand and look down because of my neck. It's—that's, you know—[5]

. . . .

Q.[Kenneth's Counsel] Ms. Carlin, during the three years you've received alimony you've made no efforts whatsoever to get a job, have you?

A. This is true.

Q. As a matter of fact, you didn't even go to Ace Hardware, they—the daughter sent an application or brought an application home for you; isn't that right?

A. That's true.

. . . .

Q. You've also testified in your deposition that you took—during the last three years you've taken one course regarding getting familiar with computers; is that right?

A. Yes.

Q. And that was, I believe, a five week course of about two hours classroom per week, for a total of about 10 hours instruction; is that right?

A. I believe that's right.

---

**5.** No further testimony explains or elaborates on Margaret's neck condition which did not permit her to "look down."

Q. Okay. Other than that one course have you done anything to try to develop skills within the last three years for you to be employed?

A. No.

. . . .

Q.[Margaret's Counsel] All right. Have you not done anything to develop any work skills or go out and work since the time of the divorce just because you thought you had a gravy train with this $1,100 from Mr. Carlin or—

A. Well, no, not at all. The main reason I haven't sought work was because of my mother, and since I've sought to put her in a nursing home I haven't felt comfortable just leaving her all the time—

Q. Okay.

A. —for 8 or 10 hours a day.

Q. All right.

A. And—

Q. If—if your mother had not been with you at the time of the divorce to the present do you feel that based upon your knowledge of your body and the rheumatoid arthritis that you would have been physically able to go out and work 40 hours, 8 hours a day, 5 days a week?

A. I don't—I don't think so. I haven't tried it, but I don't think so. I can handle part time all right, but I don't think I would be able to hold down a full time 5 days a week for any—for a whole year.

After a careful review of the evidence, we find the trial court abused its discretion in ruling that Margaret's spousal maintenance should continue. The "guiding rules and principles" in this case were the provisions of Section 8.054(b) which permitted the continuance of spousal maintenance

upon a finding that the obligee spouse is "unable to support [ ] herself through appropriate employment because of an incapacitating physical [ ] disability." The evidence certainly indicates that at the time of the hearing Margaret continued to suffer with the variety of maladies indicative of rheumatoid arthritis. However, an examination of all the evidence indicates that her condition was far from "incapacitating." She was able to drive, cook, clean, and do other household chores in order to maintain her 3,800 square foot house. To top it off, Margaret was still able to provide "very adequate care" to her Alzheimer's-stricken mother. It appears the trial court overlooked the need for sufficient proof of this provision in Section 8.054.

Further support for our conclusion is indicated by Margaret's totally **subjective** testimony that she did not "think" she could hold down full-time employment, although she admitted she had not tried to do so and her only point of reference was to what she was doing at her current part-time job with Ace Hardware. By contrast, the record before us contains quite a bit of **objective** facts testified to by Margaret as to what she is physically able to accomplish in her daily life. What Margaret testified she is physically able to do indicates that her arthritis has placed few physical limitations on her life. Lastly, because Margaret admittedly never attempted to seek employment that would provide for her "minimum reasonable needs,"[6] a finding that Margaret proved she was unable to support herself at appropriate employment because of her arthritis would be unreasonable.

Clearly, Margaret's ankles, shoulders, and neck are impaired to some degree. It simply does not follow, however, that because her job-related activities at Ace

6. *See* Section 8.054(a)(2).

Hardware would possibly present difficulties for her if the job were for a full eight-hour workday, Margaret has conclusively established that she **continues** "to be unable to support herself at appropriate employment." Because she fully admits that she has done nothing to seek employment or make any inquiries related thereto, the "link" between what evidence there is as to Margaret's physical limitations due to the arthritis and her being unable to support herself through appropriate employment lacks the probative force necessary to prove the statutory conditions for continuing the spousal maintenance.

Finally, we find very probative the two portions of Margaret's testimony where she, quite candidly, admits that the main reason for her not seeking employment was because of the need to provide continued care for her mother. We do not take Margaret's sense of duty to her mother lightly. Nevertheless, we must also do justice to Kenneth's right to have the provisions of Chapter 8 applied as the legislature intended. The legislature set-out the purpose of Chapter 8 as follows:

> SECTION 10.01. PURPOSE. (a) It is the intent of the legislature in this article to provide spousal maintenance primarily as a temporary rehabilitative measure for a divorced spouse whose ability for self-support is lacking or had deteriorated through the passage of time while the spouse was engaged in homemaking activities and whose capital assets are insufficient to provide support.

*See* Act of May 26, 1995, 74th Leg., R.S., ch. 655, § 10.01(a), 1995 Tex. Gen. Laws 3543, 3577.

■ It is an abuse of discretion for a trial court to rule without supporting evidence. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). In the instant case, while there is "some" evidence of Margaret's inability to support herself at appropriate employment because of her disability, the great weight and preponderance of the trial evidence is against such a finding. We have detailed all relevant evidence from the record, as set out above, in reaching this conclusion. *See Rose v. Doctors Hospital,* 801 S.W.2d 841, 848 (Tex.1990). We therefore reverse the trial court's ruling of November 13, 2001, (granting extension of spousal maintenance) and remand this cause for further proceedings consistent with the analyses and holding made in this opinion.

REVERSED AND REMANDED.