In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-16-00392-CV

**JIMMY RAY ROBERSON JR. AND MISTY ROBERSON, Appellants**

**V.**

**UNION PACIFIC RAILROAD COMPANY,**
**Appellee**

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-194,123**

## MEMORANDUM OPINION

Jimmy Ray Roberson Jr. and Misty Roberson[1] appeal the trial court's judgment following a jury trial. In four appellate issues, the Robersons challenge the trial judge's overruling of their motion for new trial, in which they alleged that the evidence conclusively established that Union Pacific's negligence was a proximate

_____

[1]When referring to appellants individually, we will refer to Jimmy as "Roberson" and to Misty by her first name.

cause of the accident and that Jimmy's negligence was not. We affirm the trial court's judgment.

## PROCEDURAL AND FACTUAL BACKGROUND

The Robersons filed suit against Union Pacific Railroad Company ("Union Pacific"), alleging that Jimmy was severely injured when a tractor-trailer owned by T and D Solutions, LLC ("T & D") was struck by a Union Pacific train.[2] The Robersons asserted that Jimmy was in the driver's seat of the tractor-trailer, which was positioned across the train tracks at the time of the collision. The Robersons contended that Union Pacific, as well as Union Pacific's engineer and conductor, were negligent and grossly negligent, and that their negligence proximately caused Jimmy's injuries and damages. In addition, the Robersons alleged that Union Pacific acted intentionally by instructing its engineers to ignore written safety rules to keep on schedule and to assume that obstructions on the tracks will move. Misty asserted claims for loss of consortium, loss of household services, and mental anguish.

---

[2]The case began as a lawsuit by the surviving family members and the estate of Robert Grant, Roberson's co-worker who was killed in the accident. Jimmy Roberson was named as a defendant in that lawsuit, along with Union Pacific and other defendants. The Robersons asserted a cross-claim against Union Pacific and other parties. The Robersons state in their brief that the portion of the case involving Grant settled, and the instant case involved the Robersons as plaintiffs and Union Pacific as the defendant.

2

James Carter, Union Pacific's corporate representative, testified that the accident occurred on February 19, 2013, at approximately 8:00 a.m. Carter explained that the crash involved a collision between a low-boy trailer that was carrying a crane and Union Pacific's "consist" that contained five locomotives. According to Carter, the consist was being operated by two Union Pacific employees: engineer Leroy Price and conductor L.V. McQueen Jr. Carter testified that the tractor-trailer was stopped at the grade crossing approximately fifty-three seconds before the consist struck it. Carter stated that Price should know the approximate required stopping distance in both normal and emergency braking situations. Carter testified that the "entire stretch" a few miles back from the crash site, was straight and flat, and the engineer and conductor had an unobstructed view as they proceeded down the tracks. In addition, Carter explained that the weather was good on the day of the crash, and Price should have been able to see at least one mile down the tracks.

According to Carter, on the day of the accident, Price and McQueen were operating the locomotive at approximately fifty-nine miles per hour, and the locomotive's speed at the time of the impact was fifty-seven miles per hour. Carter opined that Price and McQueen probably could have seen Roberson's trailer, but the tractor would have been hidden by the trees.

3

Carter explained that Union Pacific operates under a General Code of Operating Rules ("GCOR"), which are divided by craft and govern all employees, including Price and McQueen. Carter testified that one of the purposes of the GCOR is to prevent injuries and fatalities to the general public, and he explained that the rules must always be in writing. According to Carter, the GCOR requires employees to exercise vigilant lookout, observe what is in their field of vision, and to respond without hesitation. Carter explained that the GCOR also require that in case of any doubt or uncertainty, an employee must take the safe course of action without hesitation. Carter testified that the GCOR applied to Price and McQueen during the entire fifty-three seconds they were able to see the tractor-trailer on the tracks. In addition, Carter testified that one of the GCOR instructs engineers and conductors to operate efficiently and to avoid unnecessary delays.

Carter stated that engineers are not specifically taught not to stop or slow down until they are certain that a car on the crossing will not move, but Union Pacific does teach engineers to assume that a vehicle will move "[o]utside any warning that it's not go[ing to] move or it's disabled[.]" Carter testified that vehicles that remain stopped on the tracks have approximately an eighty percent chance of being struck by an approaching Union Pacific locomotive. Carter explained that rules in the GCOR require application of the emergency brake when doing so is necessary to

4

protect life or property, and to use the maximum braking effort available that is consistent with safe train handling techniques. Carter testified that the Federal Railroad Administration ("FRA") maintained that "'[t]he physical properties of a moving train virtually always prevent it from stopping in time to avoid hitting an object on the track, regardless of the speed which the train is traveling.'"

According to Carter, "[t]here's no way to pull up the data of how many collisions at a crossing the engineer has been involved in." Carter explained that Union Pacific does not maintain databases regarding the work history of particular employees as to collisions, and he stated that the FRA does not require that such records be kept. According to Carter, operating practices inspectors and other individuals from FRA "ride with us, . . . evaluating our practices, our track structure, [and] our signal structure." Carter testified that Price's previous involvement in accidents involving fatalities could potentially affect Price's ability to safely perform his job.[3] According to Carter, Price was evaluated by many people before he was permitted to operate a locomotive again.

Carter agreed that if the emergency brake had been applied between 1700 and 2100 feet away, there would have been in time to avoid injury, death, and property

---

[3]During examination of Carter, the Robersons' counsel read into the record a portion of Price's deposition testimony, in which Price testified that he had been involved in three previous accidents involving fatalities.

5

loss. Carter testified that the locomotive's data recorder shows that four seconds after the tractor-trailer stopped on the tracks, the train's speed increased from fifty-eight to fifty-nine miles per hour. The parties stipulated that as the train approached the crossing, the engineer blew the horn in compliance with applicable regulations, the loudness of the horn complied with applicable regulations, and the background noise level at the crossing was loud enough that Roberson could not hear the horn in enough time to react before the collision. Carter also explained that emergency braking carries a risk.

McQueen's videotaped deposition was presented to the jury. McQueen testified that he began working for Union Pacific in April of 1998, and he was employed there until the date of the accident involving Roberson. McQueen explained that he was hired as a switchman and brakeman, and was subsequently promoted to conductor at the end of 1998. According to McQueen, the conductor is in a superior position to the engineer regarding the safety of the train. McQueen testified that the conductor can instruct the engineer to do something, but applying the emergency brake is the only thing the conductor can physically do on the train.

McQueen testified that the accident involving Roberson was the first crossing accident he experienced as a conductor, and that accident was the first time he needed to apply the emergency brake. McQueen explained that he did not apply the

6

emergency brake until five seconds before impact because he felt that Price was handling the train properly, and he applied the brake "when we figured that the truck wasn't going to move." McQueen testified that he saw the whistle board and checked to make sure he did not have any slow orders, and when Price told McQueen that he thought he saw something, McQueen also saw something, but McQueen "actually didn't know what it was." McQueen explained that it took him a few seconds to figure out what he was seeing, and the train was "pretty close" before McQueen and Price knew that a truck was sitting at the crossing. McQueen testified that Price was already slowing down, and he could hear Price throttling off the engines and the engines revving down. McQueen opined that Price was properly handling the train because Price was taking action and slowing the train down. McQueen testified, "We did everything right. We couldn't have done anything different."

McQueen explained that the train had the right-of-way, and he and Price believed the tractor-trailer would get out of the way. According to McQueen, "They have to get out of the way, if we're blowing the whistle. We have the right-of-way. They have to get out of the way of the track." McQueen explained that the emergency brake was not applied until five to six seconds before impact because "[t]hat's when we figured he wasn't go[ing to] move." McQueen denied that the tractor-trailer should have been visible to him and Price before they reached the

7

whistle board. McQueen explained that he and Price saw "an object down there[,]" but that they did not know what it was until they "got up on it and [saw] that it was a tractor and a trailer." McQueen testified that he and Price had to be cut out of the locomotive after the accident. McQueen testified that he was not reprimanded for the accident.

Price testified that he began working with Missouri Pacific in September of 1979, and Missouri Pacific ultimately merged with Union Pacific. Price explained that he has worked as both a locomotive engineer and in a management position as Director of Road Operations ("DRO"). According to Price, part of his job duties as DRO included investigating collisions and other critical incidents, and he did not recall ever finding fault with an engineer in a crossing accident. Price testified that if an engineer appeared to be experiencing emotional problems, physical problems, or fatigue, Union Pacific would require a check ride, and if Union Pacific determined that there was a problem, the engineer would be removed from the job and put into a training period. Price explained that when his position as a DRO ended with Union Pacific, he returned to working as an engineer approximately one year before the accident involving Roberson.

Price testified that as an engineer, he had been in other accidents that involved fatalities. Price never received psychological or psychiatric care from Union Pacific

8

after the previous accidents, but he did begin seeing a psychiatrist for post-traumatic stress disorder at some point after the February 2013 accident, and he had been seeing the psychiatrist for approximately a year and a half at the time of trial. According to Price, his psychiatrist advised him not to return to work as an engineer. Price testified that until the accident with Roberson, he felt that he was "a hundred percent competent."

Price stated that on February 19, 2013, he was working with McQueen for the first time. Price explained that the weather was clear and sunny, and he had an unobstructed view down the tracks. Price testified that the locomotive's lights were turned on. According to Price, there are no lights or gates at the crossing where the accident occurred. Price opined that from a half-mile away, given the lighting conditions that existed on the day of the accident, he could not have determined that he needed to be concerned about the object on the tracks. According to Price, there were no indications that the vehicle was disabled or in an emergency situation. Price testified, "If they were out flagging, I would have stopped. I would have [done] my best with everything I had to stop, if somebody had been there and let me know that something was wrong." Price did not see the tractor-trailer as it came over the crossing. Rather, Price testified that he first noticed something across the tracks when he blew the whistle after the whistle board, and the whistle board was 2022

9

feet from the crossing. According to Price, even if he had seen the tractor-trailer when he was at the whistle board, he probably could not have stopped the train in time. Price explained that Union Pacific's data sheet indicated that he blew the whistle seventeen seconds before the crash occurred. Price testified that he used the maximum braking effort.

Price explained that after the accident occurred, he notified the dispatcher by radio. According to Price, when a railroad experiences a crossing collision, it must be reported to the FRA within twenty-four hours, and he did so. Price testified that after the accident, he reported to Union Pacific that it should take better care of its crossings, but that was before he learned from Roberson's deposition that Roberson was not stuck on the tracks. Price denied that Union Pacific trained its engineers to believe that all vehicles stopped on a crossing will move. Price explained, "Every situation is different. Just you take care of the situation. You just look at what's happening, and then you put together everything. The grade, the speed, how heavy you are, you go by all of this kind of stuff." Price agreed that he testified at his deposition that if he slowed down or stopped every time a vehicle pulled onto the crossing, the train would never arrive and he would be out of a job.

Price testified that when a train is approaching a vehicle stopped on a crossing, the engineer looks for signs of distress or an emergency situation, such as someone

waving his hand with a flag, a light, a hood raised on a vehicle, or other indications of a problem. Price explained that if he could see that a vehicle was stuck, he would take emergency action right away. According to Price, if no signs of distress or emergency exist, in his experience, the vehicle will generally move. Price testified that prior to the accident with Roberson, he had never struck a vehicle that was stopped on a crossing. Price explained that when he returned to work after the February 2013 accident, he was required to do test rides, check rides, and retake a rules test, and he was tested and analyzed by multiple managers. Price testified that he had passed all of the required testing at Union Pacific, such as rules training, check rides, and simulator training.

Billy Edward Gearan testified by videotaped deposition that he began working for Union Pacific as a switchman, brakeman, and conductor in 2002. Gearan explained that he began training as an engineer and was promoted in April 2006. Gearan stated that he was also a safety facilitator and coordinator in Union Pacific's transportation department for two years before going to work as manager of operating practices. As a manager of operating practices, Gearan supervised all transportation employees, which included checking on the engineers and ensuring that the engineers understand and comply with the rules. He also performed

efficiency testing as required by FRA regulations. Gearan testified that he returned to working as an engineer on April 16, 2016.

According to Gearan, engineers know how to calculate the amount of braking power they have. Gearan explained that tons per operative brake is the weight divided by the amount of brakes in the train, and engineers make this calculation before starting their routes. According to Gearan, it is feasible that a forty-year-old man could see a mile on a clear day when his vision is not obstructed. Gearan stated that an engineer can use binoculars, but "the naked eye is the safest way to operate our train out there." According to Gearan, Union Pacific requires its engineers to take hearing and vision tests every three years.

Gearan explained that after the February 2013 accident occurred, he retrieved event recorder data and downloads from the locomotives in the consist, reported the data, and put the data into a database. Gearan testified regarding the times when the throttle was decreased. According to Gearan, brakes were applied at 7:56:04, and the moment of impact was 7:56:09. Gearan testified that he did not take exception to how Price operated the train.

Roberson testified that when the accident occurred, he was employed as a Class A lineman by T & D, which does contract work for Entergy that involves maintenance and construction. Roberson explained that being a Class A lineman is

physically demanding. Roberson holds a commercial driver's license, which allows him to drive tractor-trailers and 18-wheelers, and he used that license working for T & D.

On the day of the accident, Roberson was hauling a Mantis crane, which is an oversize load, on a tractor-trailer. Roberson testified that T & D informed him that he would need to cross railroad tracks and to make sure that he could clear the tracks. Roberson testified that he did not know the exact weight of the load he was carrying. Roberson explained that the tractor-trailer sits low to the ground and has a hydraulic lift. According to Roberson, he could not have raised the tractor-trailer to its maximum height before attempting to drive it because it would have made the equipment unstable due to the turns that he had to make. As Roberson proceeded down Highway 90 toward Beaumont, he saw his co-workers, Andrew Cain and Joseph Grant, on the side of the road, and he saw the private crossing where the accident occurred. Roberson explained that he entered the median and raised his trailer to accommodate the tracks.

According to Roberson, he got back into his truck, turned right, came to the stop sign, looked, did not see anything, and proceeded to cross the tracks. Roberson testified that it was his responsibility to decide how high to raise the trailer so that stopping on the tracks would not be necessary. The cab of Roberson's truck cleared

13

the tracks, and he testified that he could then feel the trailer rubbing the tracks, so he stopped. Robertson explained that if he had pulled the trailer over the tracks at that point, he would have damaged the tracks, and he was also concerned about damaging the trailer.

Roberson testified that he looked both ways and did not see a train coming. Roberson stated that once he looked both ways before going over the crossing, he focused his attention ahead because he was concerned with getting across the tracks. Roberson explained that he looked down the tracks again, removed his seat belt and got out of the truck, and he informed Cain that he was going to raise the trailer. According to Roberson, the trailer was not stuck on the tracks, and he felt that he could get it off the tracks. Roberson testified that he was concerned with getting the tractor-trailer off the tracks as quickly as possible even though he did not see a train. According to Roberson, he could not back up because his truck would protrude onto the highway.

Roberson testified that neither Cain nor Grant indicated that they saw an approaching train. Roberson explained that he was not constantly looking for a train, and he "cannot tell you what Cain and Grant [were] doing." Roberson stated that he did not see the train or hear its horn, and he explained, "I believe the train saw me way before I saw it." Roberson raised the trailer and got back into the truck.

14

Roberson testified that when he turned to go back to the truck, he did not look both ways down the tracks. Roberson explained that when he got back into the truck, "that's when I heard the train. . . . I heard the horn and caught it out of the corner of my eye. . . . It just didn't seem real. . . . and then boom." Roberson stated that he remembered being struck by the train, "bouncing all over the place[,]" getting out of the truck, and then passing out and awakening in the hospital. According to Roberson, he suffered internal bruising, a concussion, and injuries to his ribs, back, and knees. Roberson stated that he was in pain and could hardly breathe. Roberson had surgery in January of 2014, and he had pain management treatment.

Cain testified by videotaped deposition that he began working for T & D in June of 2012 and is currently employed there as a Class C lineman. Cain explained that he normally worked on the same crew with Grant. Cain testified that he had been to the site before the accident to review the area, and he knew there were railroad tracks there. Cain's foreman had instructed him and Grant to help Roberson unload the truck when it arrived at the job site. According to Cain, on the day of the accident, he and Grant proceeded to the crossing in a truck to await Roberson's arrival. Cain testified that he crossed the tracks after looking left and right, and Cain and Grant both got out of the truck. Cain testified that he and Grant both looked both ways as they walked toward the tracks.

According to Cain, Roberson made a right turn and attempted to pull across the tracks, and Roberson stopped when his trailer hit the tracks. Cain explained that the trailer was not stuck, but it had made contact with the tracks. Cain testified that Roberson got out of the truck and tried to raise the trailer. Cain testified that he never looked back toward the Liberty side of the tracks after Roberson started raising the trailer, and he did not see the train until the impact occurred. When asked whether anything obstructed his vision, Cain testified, "[t]here's a tree line there, but it's not really in the way." According to Cain, after Roberson adjusted the trailer, he did not give Cain or Grant instructions about looking out for an approaching train. Cain testified that the train hit Roberson's truck a few seconds after Roberson had gotten back into the truck. After the accident occurred, Cain attempted to perform first aid on Roberson and then moved to Grant, and he determined that Grant was dead. Cain explained that he believed, he, Grant, and Roberson acted in a safe manner.

Rodney Ellis, a safety consultant in the trucking industry and a litigation support person for trucking accidents, testified that Roberson's counsel retained him to investigate the accident that occurred on February 19, 2013. According to Ellis, T & D has a good rating for safety, Roberson was a properly licensed and experienced commercial driver, and Ellis had not reviewed any evidence to indicate that

16

Roberson was not qualified. In addition, Ellis testified that T & D had obtained the proper permit for the job in which Roberson was involved on February 13, 2013.

Ellis testified that eight inches was a proper way to transport a tractor-trailer, which is where Roberson had the trailer set when he embarked on the day of the accident. Ellis explained that the trailer is "not designed to travel in the elevated position." According to Ellis, "the higher you raise that unit, the more unstable it is." Ellis opined that Roberson's decision to raise the trailer in the median of the highway was the safest decision Roberson could make, and he testified that he did not believe Roberson could have adjusted the trailer by stopping on the shoulder of Highway 90 because portions of the shoulder are composed of gravel and are unlevel. Ellis explained that a driver should not raise a trailer beyond where he feels he will have sufficient clearance. Ellis testified that once Roberson felt scraping, stopping at that moment was the appropriate response. According to Ellis, when a trailer scrapes a railroad track, there is a risk that the track and the trailer could be damaged.

Ellis explained that Roberson should not have proceeded forward despite hearing the scraping because it would only worsen as he moved farther forward, and he might have gotten "hung up." Furthermore, Ellis testified that it could have been unsafe for Roberson to back up because he could either have gotten stuck or backed into the highway. Ellis also opined that there was nothing wrong with Roberson

relying on Cain and Grant to serve as spotters. During cross-examination, Ellis stated that Roberson incorrectly estimated the necessary height to get the trailer across the tracks. Ellis also testified that in addition to watching the trailer while he was raising it, Roberson should have been scanning the area and looking down the track. Ellis also agreed that when working in a high-noise environment, it is more important to keep a proper lookout.

Physicist and mathematician Stuart Nightenhelser testified that he is employed by Wolf Technical Services. Nightenhelser explained that part of his work includes forensic engineering, including train accident reconstruction. Nightenhelser explained that "the part of optics that pertains to visibility, lighting which is necessary for vision, human vision, that kind of thing, is a part of human factors." According to Nightenhelser, his field includes what could have been visually perceived at different points of time and under different circumstances, such as lighting, color, brightness, and how an object is presented against its background. Nightenhelser opined that McQueen and Price should have easily recognized the crane from at least a mile away as a large object on the track. Nightenhelser explained that the crane was white, and it contrasted against a darker background of vegetation. Nightenhelser also stated that the two rails going into the horizon provided another visual cue. According to Nightenhelser, "it's the white body of the

18

crane primarily that you're [going to] see and that's [going to] get your attention from a mile out and then on into half a mile and so forth."

Nightenhelser opined that no external warning sign was required to alert the crew that the tractor-trailer would not move from the tracks. Nightenhelser explained:

> [I]n the same way that motion is a visual cue, lack of motion is a visual cue. So, if you've been aware and looking ahead of you and seen this thing sitting there stationary for that entire 34 seconds prior to 1400 feet, that's a pretty strong visual cue that this thing's not going anywhere."

In addition, Nightenhelser testified that Roberson's and Cain's view down the track would have been obstructed by vegetation. During cross-examination, Nightenhelser stated that motion tends to get attention. Nightenhelser also testified that immediately before the collision, both Grant and Cain had an unimpeded view of an approaching train. Nightenhelser admitted that during his deposition, he testified that the men could have seen the train when it was far enough away to allow them to move away. Nightenhelser agreed that Roberson would not have been injured if he had looked before getting back into the cab of his truck.

Jimmy Calvin Scott, a safety consultant regarding issues involving railroad operations, testified that he reviewed numerous documents, as well as the event data recorder, and video, and he had inspected the accident site and viewed the tractor-

trailer and crane at the junkyard. Scott testified that he also viewed the locomotive and read various rules and regulations in the GCOR that apply to operation of a locomotive. Scott explained that the data from the event data recorder enabled him to evaluate the decisionmaking of the engineer and conductor. Scott opined that Union Pacific did not follow the GCOR when the crash occurred. According to Scott, an attentive engineer and conductor should have been able to see the tractor-trailer at least fifty-three seconds away from it. Scott opined that the distance between when McQueen and Price should have seen the tractor-trailer versus when they did see it covered approximately 3000 feet, making both Price and McQueen in violation of the GCOR. Scott testified that the conduct of Price and McQueen was not consistent with safe operation practices, and both men were negligent and failed to apply the brakes in a proper manner because they waited until four seconds before impact to apply the emergency brake. In addition, Scott testified that emergency braking would not have been necessary if McQueen and Price had been alert and attentive because "they had plenty of time to stop otherwise." Scott testified that Union Pacific exonerated its crew with respect to the accident.

Union Pacific presented the testimony of Russell McGowan by videotaped deposition. McGowan testified that he has worked for T & D approximately seven or eight years, and he currently works for T & D as a safety training compliance

20

coordinator. McGowan stated that his work sometimes involved driving tractor-trailers like the one involved in the February 2013 accident. McGowan explained that in preparation for traversing a railroad crossing, he generally raised his trailer as high as it would go. The defense then rested.

Question one of the charge submitted to the jury asked whether the negligence of Union Pacific or Roberson proximately caused the occurrence. The jury answered "no" as to Union Pacific and "yes" as to Roberson. Roberson filed a motion for new trial, in which he alleged, among other things, that the evidence was legally and factually insufficient to support the jury's response to question one. The trial judge overruled the motion for new trial, rendered judgment in favor of Union Pacific, and ordered that the Robersons take nothing.

ISSUES ONE, TWO, THREE, AND FOUR

As discussed above, the Robersons raise four appellate issues. In issue one, the Robersons argue that the trial court erred by overruling their motion for new trial because the jury's "no" finding as to Union Pacific's negligence was against the great weight and preponderance of the evidence. In issue two, the Robersons assert that the trial court erred by overruling their motion for new trial because the evidence conclusively established all vital facts in support of an answer of "yes" as to Union Pacific. In issues three and four, the Robersons argue that the trial court erred by

21

overruling their motion for new trial because the evidence was factually insufficient to support the jury's finding of "yes" as to Roberson's negligence, and that there was no evidence supporting the jury's answer. We interpret the Robersons' issues as challenging the legal and factual sufficiency of the evidence supporting the jury's answers to question one. Because the Robersons' issues are interrelated, we will address them together.

We review the denial of a motion for new trial for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Under an abuse of discretion standard, legal and factual sufficiency of the evidence are relevant factors in assessing whether the trial court abused its discretion. *Lesikar v. Moon*, 237 S.W.3d 361, 375 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991)); *see Carlin v. Carlin*, 92 S.W.3d 902, 905 (Tex. App.—Beaumont 2002, no pet.). In a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.*

22

The factfinder is the sole judge of the credibility of the witnesses and is responsible for resolving any conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Id*. at 819-21; *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). As factfinder, the jury is free to disbelieve expert witnesses. *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.—Beaumont 2001, pet. denied); *see also Yap v. ANT Freight Sys., Inc.*, 789 S.W.2d 424, 427 (Tex. App.—Houston [1st Dist.] 1990, no writ). "[O]pinion testimony, even when uncontroverted, does not necessarily bind the jury." *Waltrip*, 38 S.W.3d at 882.

> [T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, and we will set aside the trial court's finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly unjust. *Dow Chem. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). As long as the evidence falls within the zone of reasonable disagreement, we

23

cannot substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822.

As part of their arguments on appeal, the Robersons cite *So. Pac. Transp. Co. v. Peralez*, 546 S.W.2d 88, 94 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) and state that *Peralez* was "[t]he last case thoroughly analyzing a train crew's duty to slow or stop a train in a crossing collision case, when faced with unchanging conditions, like a vehicle stationary on the tracks[.]"Determining whether a defendant breached a duty is a question of fact. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 526 (Tex. 1990); *Atchison, Topeka and Santa Fe Ry. Co. v. Standard*, 696 S.W.2d 476, 479 (Tex. App.—Eastland 1985, writ ref'd n.r.e.). We conclude that *Peralez* and other such duty cases cited by the Robersons do not govern the jury's resolution of the issue of the parties' negligence presented in question one of the charge.

The jury heard conflicting evidence from both lay and expert witnesses regarding what Price and McQueen could or should have seen and how quickly they could or should have reacted. In addition, the jury heard evidence that Roberson did not raise the tractor-trailer to its maximum height before attempting to cross the tracks, and the jury heard conflicting evidence about the safety or advisability of driving a tractor-trailer in a fully-elevated position. The jury also heard evidence that

once Roberson stopped on the tracks, his focus was on raising the tractor-trailer and getting off the tracks, and he did not look both ways down the tracks before returning to his truck.

It was the province of the jury to resolve conflicts in the evidence, weighing the evidence, and to draw inferences from basic facts to ultimate facts. *See Garza*, 164 S.W.3d at 625; *see also Waltrip*, 38 S.W.3d at 882. Crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not, we conclude that the evidence would enable reasonable and fair-minded people to conclude that Union Pacific's negligence did not proximately cause the occurrence and that Roberson's alleged negligence did proximately cause the occurrence. Therefore, the evidence is legally sufficient. *See City of Keller*, 168 S.W.3d at 827. Furthermore, considering and weighing all of the evidence, we conclude that the evidence supporting the challenged findings is not so weak nor are the jury's findings so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Therefore the evidence supporting the jury's findings is factually sufficient. *See Francis*, 46 S.W.3d at 242. Because the jury's findings were supported by legally and factually sufficient evidence, we conclude that the trial judge did not err by overruling the Robersons' motion for new trial. *See Waffle House, Inc.*, 313 S.W.3d at 813; *Lesikar*, 237 S.W.3d at 375.

25

Accordingly, we overrule issues one, two, three, and four, and we affirm the trial court's judgment.[4]

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on November 29, 2017
Opinion Delivered March 22, 2018

Before McKeithen, C.J., Kreger and Johnson, JJ.

---

[4]Union Pacific raises two cross-points, in which it contends that (1) it is entitled to judgment as a matter of law because its crew applied the brakes when confronted with an imminent collision, and (2) it is entitled to judgment as a matter of law because the evidence established that Roberson was negligent per se and that his percentage of responsibility was greater than fifty percent. Although Union Pacific does not expressly indicate that its cross-points are conditional upon this Court granting relief to the Robersons on appeal, we interpret their cross-points as conditional. We need not address Union Pacific's cross-points because we are affirming the trial court's take-nothing judgment in favor of Union Pacific. *See generally* Tex. R. App. P. 47.1.

26